UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRANDON EDWARD GORECKI,

    Petitioner,

v.                                                            Civil Action No. 10-cv-12429-BC
                                                             Honorable Thomas L. Ludington

MARY BERGHUIS,

    Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS
CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY
OR PERSMISSION TO PROCEED IN FORMA PAUPERIS ON APPEAL**

    Petitioner Brandon Edward Gorecki is a state inmate incarcerated by the Michigan Department of Corrections, currently housed at the Chippewa Correctional Facility in Kincheloe, Michigan. He is serving a life sentence for first-degree murder. Along with his life sentence, Petitioner also serves concurrent sentences of twenty to thirty years for torture and robbery, two to five years for larceny, and one to four years for larceny in a building. His convictions followed a jury trial in the Michigan Circuit Court of St. Clair County on February 2, 2007. He was sentenced on February 28, 2007.

    On June 21, 2010, Petitioner filed a habeas petition in this Court pursuant to 28 U.S.C. § 2254. The petition was filed through counsel, and it challenges the constitutionality of Petitioner's convictions. He raises a single claim concerning his Confrontation Clause rights. The Court concludes that Petitioner's convictions and sentences are constitutionally sound, and, for the reasons set forth, denies the petition. The Court also declines to issue Petitioner a certificate of appealability.

# I

Petitioner's convictions resulted from an incident that occurred on May 31, 2006, which led to the death of Maryann McNeeley. The prosecution's theory was that Petitioner, aided by his half-brother Ray Carp, killed McNeeley in her home and stole various items. The defense did not dispute that Petitioner caused McNeeley's death. Rather, the defense disputed whether the murder was premeditated or committed in the course of a felony. Carp was tried separately and before Petitioner's trial. Petitioner, over his counsel's advice, waived his Fifth Amendment privilege and testified as a defense witness at Carp's trial. Carp also was convicted and sentenced to life in prison.

Prior to trial, the prosecutor filed a motion with the trial court requesting the admission of statements allegedly made by Carp, following the incident, to his girlfriend Kelly Smith. Petitioner's counsel objected on the basis that it was more likely than not that he would not have the opportunity to cross-examine Carp because it was probable that Carp would not be testifying in Petitioner's trial. The trial court deferred ruling on the motion until it was determined whether Carp would testify.

Subsequently, at the beginning of the trial, Carp was called to the stand, out of the presence of the jury, and stated that, based on his counsel's advice, he would assert his Fifth Amendment right and refuse to testify if called as a witness.

Then, during trial, the prosecutor made an offer of proof, outside the presence of the jury, concerning Smith's proposed testimony. *See* Trial Tr. vol. II, 450–79, Jan. 31, 2007, ECF No. 5. Smith testified that Carp told her that Petitioner stabbed McNeeley and that he was present. He said he hit McNeeley in the head with a mug and handed the knife to Petitioner. On cross-examination,

Smith acknowledged that Carp did not initially tell her what happened, but that it came out in "bits and pieces." *Id.* at 457. She admitted that she learned the information over time rather than in one statement. She said Carp was worried that Petitioner was going to get arrested, and asked her not to say anything.

Following Smith's testimony, the parties made their respective arguments to the trial court about whether her testimony concerning the statements would be admissible. The trial court ruled that she would be permitted to testify as to all of the statements allegedly made to her by Carp. Smith later testified to the same in the presence of the jury.

The primary evidence in Petitioner's case came from the testimony of Shavaun Fink, Petitioner's girlfriend at the time of the incident, and from Petitioner's own testimony at Carp's trial.

Fink testified that, at the time of the incident, Petitioner was living with McNeeley. She was at McNeeley's house that night, with Petitioner, their infant daughter, Carp, and McNeeley. Twice that night, she awoke and found Petitioner going through her purse. She believed he was trying to get the keys to her car. They argued. She said that, at one point, Petitioner grabbed her by the neck. McNeeley came out of her bedroom and tried to keep him away from her so she could leave. She then took her daughter and left. She did not witness any violence between Petitioner and McNeeley at that time.

Fink said she got a call from Petitioner later that night; he said he needed to talk. He was at his mother's house and asked her to come over. She complied. Once there, Petitioner told her he had an argument with McNeeley, and that he thought he killed her. Fink said McNeeley's truck was at the house. Petitioner told Fink that he was going to drive to Detroit and asked if she would follow

him in her car so he would have a ride back. She agreed. However, when they got to Detroit, he told her he was going to burn the truck. She then left him there.

On cross-examination, Fink acknowledged that Petitioner had been drinking on the night of the incident but denied that he had a drinking problem. She acknowledged, however, that he had a problem with the use of prescription drugs, and that he had an anger problem and was prone to spontaneous bouts of anger, particularly when he was drinking or using drugs.

Fink also testified that she saw Petitioner interact with McNeeley that night, and acknowledged that they were friends and rarely argued. She admitted that he called McNeeley his aunt, even though they were not related. She never heard him say anything negative about her.

Fink further testified that, although Petitioner was going through her purse to get her car keys on the night of the incident, she did not find anything missing. When he later told her that he thought he might have killed McNeeley, she didn't ask any questions. She admitted that they had physically fought in the past and that he had stolen items out her purse and used her car without her permission.

Petitioner's friend, Amy Haglund, testified for the prosecution. Petitioner called her the night of the incident and asked her to drive to Detroit to pick him up, but she was unable to comply. He showed up at her house later and stayed with her the rest of the day. He then received a phone call and, after the call, he told her that he was suspected of having killed McNeeley. She said he appeared surprised to learn that McNeeley was dead. The police then came to her house and arrested him.

Petitioner's mother, Margaret Carp, also testified for the prosecution. She said that, about a month prior to the incident, she kicked Petitioner out of her house. He then went to live with

McNeeley; McNeeley thought she could help him with his problems. She testified that she received a phone call from Petitioner on the day in question. He told her he had a fight with McNeeley and may have hurt or killed her. She picked up McNeeley's boyfriend and went to the house. Looking through a window, they saw blood on the floor. They called the police.

On cross-examination, Ms. Carp said Petitioner knew McNeeley all of his life and referred to her as "Aunt Maryann." Trial Tr. vol. II, 342. She admitted he had drug and mental problems; she had a hard time with him when he lived with her. She also knew he had anger-management problems, and that McNeeley knew about those problems. McNeeley never told her she was having problems with him.

Christian Yeatts, Ms. Carp's boyfriend, testified that he saw Petitioner and Carp arrive at their mother's house early that morning. They drove in McNeeley's truck. He testified that he also went with Ms. Carp and McNeeley's boyfriend to her house, which led to the discovery of her body.

The prosecution also presented testimony from several police officers concerning the investigation of the case, as well as from a medical examiner concerning McNeeley's cause of death.

The police entered the home after being called by Ms. Carp and Yeatts. They found McNeeley's body. It appeared to them that someone had tried to clean up the blood on the floor. There were no signs of forced entry.

A serologist testified about the blood found at the scene. An arson expert testified about McNeeley's truck, which was found parked in Detroit and severely damaged by fire. The expert concluded that the fire had been intentionally set.

The medical examiner testified that McNeeley died from numerous stab wounds and blunt-force injuries. The doctor estimated that she received over fifty wounds. None of the stab wounds

was to the chest. It was his opinion that McNeeley was alive and conscious during a portion of the assault, because he found a number of defensive-type wounds to her hands and arms. The number and nature of the wounds showed that the assault took place over several minutes.

At the close of the prosecution's case, the agreed-to, redacted portions of the video-recorded testimony from Petitioner at Carp's trial were played for the jury. Trial Tr. vol. III 624-25, Feb. 1, 2007, ECF No. 5. Petitioner admitted that he was with Carp at McNeeley's house on the night in question. He denied any pre-existing plan to steal McNeeley's truck or any other property. He testified that Carp did not take any of the property from the home and did not take the keys to the truck. He admitted that he drove the truck, with Carp, to their mother's house. He told Carp to close the drapes in the home during the incident and also told Carp to hit McNeeley with a mug. According to Petitioner, Carp threw a mug at her but missed hitting her. Petitioner denied that Carp held McNeeley down or handed him knives. He denied that Carp expressed an intent to harm McNeeley. He further denied that Carp had anything to do with the arson of the truck.

On cross-examination at Carp's trial, Petitioner admitted that he stabbed McNeeley numerous times. Trial Tr. vol. II, 457. He said his memory of the incident was clouded because he was under the influence of alcohol and Xanax. He admitted he struck McNeeley with at least one mug. He denied going through Fink's purse. He said he and Carp left McNeeley's house after his argument with Fink and returned later that night. He said he did not remember how the fight started. He said McNeeley had a knife in her hand, and he took it away from her. He did not remember why he asked Carp to close the drapes.

Petitioner testified that he had tried to clean up the blood in the home after the incident. He said he got the keys to the truck from McNeeley's room, drove it back to his mother's house and

then later to Detroit, where he set it on fire. He admitted taking the stereo and DVD player. He said those items were still in the truck when he burned it. He could not explain why the police did not find any evidence of them.

The defense did not present any evidence.

During closing arguments, Petitioner's trial counsel acknowledged that Petitioner was responsible for McNeeley's death, but argued that her murder was not premeditated, that the theft of the items occurred only after the homicide, and that there was no plan to steal anything or rob her at the time of the homicide. He asked the jury to convict Petitioner on the lesser-included offense of second-degree murder rather than on the charged offense of first-degree murder.

In his instructions to the jury, the trial judge instructed on the alternative theories of premeditated and felony murder on the first-degree murder count and did give the jury the option to convict Petitioner on the lesser-included offense of second-degree murder.

The jury convicted Petitioner of first-degree murder. He was sentenced as described.

Following his sentencing, Petitioner filed a direct appeal with the Michigan Court of Appeals, raising the same claim raised in this habeas petition. The Court of Appeals affirmed his convictions and sentences. *People v. Gorecki*, No. 277448, 2008 WL 4604396, at *1, *3 (Mich. Ct. App. Oct. 2, 2008) (unpublished). Petitioner subsequently filed an application for leave to appeal with the Michigan Supreme Court. On March 23, 2009, the Michigan Supreme Court denied the application. *People v. Gorecki*, 762 N.W.2d 485 (2009) (unpublished table decision).

Petitioner neither filed a post-conviction motion with the state trial court nor a petition for a writ of certiorari with the United States Supreme Court. Rather, he filed this habeas petition, raising the same claim raised in both state appellate courts.

## II

### A

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, section 2254(d) permits a federal court to issue the writ only if the state-court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (1)–(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, "the state court's [application of federal law must have been] objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.
>
> * * *
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405–06.

The Supreme Court has held that a federal court should analyze a claim for habeas-corpus

-8-

relief under the "unreasonable application" clause of section 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Supreme Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The Supreme Court has continued to emphasize the limited nature of this review. In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court reiterated that the AEDPA requires federal habeas courts to review state-court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785–86 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Additionally, this Court must presume that the state court's factual determinations are correct. 28 U.S.C. § 2254(e)(1) (a determination of a factual issue made by a state court shall be presumed to be correct); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (citation omitted) (finding that the court gives complete deference to state court findings of historical fact unless they are clearly erroneous). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998). Further, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**B**

In his only habeas claim, Petitioner argues that his Confrontation Clause rights were violated

when the trial court admitted Carp's out-of-court statements to Smith. Carp did not testify at his trial. Petitioner cites to the following cases for support: *Williamson v. United States*, 512 U.S. 594 (1994) (the fact that a statement is genuinely self-inculpatory is itself one of the particularized guarantees of trustworthiness that makes a statement admissible under the Confrontation Clause); *Lilly v. Virginia*, 527 U.S. 116 (1999) ( the admission of statements covered by an exception to the hearsay rule does not violate the Confrontation Clause if they contain particularized guarantees of trustworthiness); *Bruton v. United States*, 391 U.S. 123 (1968) (using the confession of a defendant in a joint trial violated the Confrontation Clause); and *Vincent v. Seabold*, 226 F.3d 681 (6th Cir. 2000) (holding that admission of non-testifying former co-defendant's hearsay statements violated the Confrontation Clause).

First, to the extent Petitioner argues that Carp's statements to Smith were improperly admitted under Michigan's rules of evidence, as statements against penal interest, his claim is noncognizable. It is well-established that "federal[-]habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Long v. Smith*, 663 F.2d 22, 23 (6th Cir. 1981). The Court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially undistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met that difficult standard. Therefore, his claim that the trial court violated Michigan's rules of evidence is not cognizable on federal-habeas review.

Second, Petitioner's claim that his Confrontation Clause rights were violated lacks merit. The Confrontation Clause of the Sixth Amendment provides: "[i]n all criminal prosecutions, the

accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause and the hearsay rule are not coextensive. *Dutton v. Evans*, 400 U.S. 74 (1970). Thus, evidence may violate the hearsay rule without violating the Confrontation Clause.

In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held that out-of-court statements that are testimonial in nature are barred by the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity for cross-examination regardless of whether the trial court finds the statements to be reliable. The Confrontation Clause is not implicated, however, when the hearsay at issue is non-testimonial. *See Davis v. Washington*, 547 U.S. 813, 823-26 (2006). The proper inquiry in deciding whether a statement is testimonial is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Untied States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2005). Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Crawford*, 541 U.S. at 51–52, 56.

Thus, whether the Confrontation Clause is implicated in this case turns on whether Carp's out-of-court statements to Smith were testimonial. The Court finds that Carp's statements to Smith cannot be considered testimonial under *Crawford*. Rather, Carp's hearsay statements were made informally, out of court or custody, to an acquaintance and not police officers, under circumstances where a person in his position would not objectively foresee that his statements might be used in the investigation or prosecution of a crime.

Indeed, Carp initiated contact with Smith. Smith did not seek to elicit statements to further

prosecution. There was no interrogation. Smith testified that Carp spoke in narrative form without any questions from her. Thus, his statements were voluntarily made and non-testimonial. And, because Carp's statements are non-testimonial under *Crawford*, they do not implicate the Confrontation Clause. *Davis*, 547 U.S. at 821.

The Michigan Court of Appeals's legal analysis on this issues was constitutionally sound. The Court of Appeals stated:

> Defendant argues that the admission of the non-testifying accomplice's (Carp) statements violated his confrontation rights as espoused in *Lilly v. Virginia*, [] and *Williamson v. United States*, []. We conclude, however, that this case is resolved by application of precedent from this Court and our Supreme Court.
>
> * * *
>
> [W]hether the statement was (1) voluntarily given, (2) made contemporaneously with the events referenced, (3) made to family, friends, colleagues, or confederates-that is, to someone to whom the declarant would literally speak the truth, and (4) uttered spontaneously at the initiation of the declarant and without prompting or inquiry by the listener.
>
> On the other hand, the presence of the following factors would favor a finding of inadmissibility: whether the statement (1) was made to law enforcement officers or at the prompting or inquiry of the listener, (2) minimizes the role or responsibility of the declarant or shifts blame to the accomplice, (3) was made to avenge the declarant or to curry favor, and (4) whether the declarant had a motive to lie or distort the truth.
>
> * * *
>
> In considering the above factors relative to the totality of the conversation between Carp and his girlfriend, the trial court correctly concluded that the testimony was admissible as Carp was undisputedly unavailable to testify, and his statements meet all of the factors in favor of admissibility. Carp volunteered the information to his girlfriend within days of the murder. His girlfriend is someone that Carp would be expected to be truthful with when imparting this type of information. There is no evidence that Carp's girlfriend prompted the statements. Indeed, she testified that she did not ask questions but simply listened to Carp as he recalled the events of the incident. There is no evidence that Carp had a motive to lie at this point. Furthermore, Carp's invocation of the "pinky swear" rule-albeit a bit

> juvenile-evidences that he was telling the truth and not expecting this information to be used in a court of law or elsewhere. Thus, the statements were properly admitted and did not violate defendant's confrontation rights.
>
> Defendant argues that *Williamson*, *Dorchy v. Jones*, [], and *Vincent v. Seabold*, [], are controlling in this case. However, *Williamson* did not address a federal constitutional question, as it remanded the matter before it based on its interpretation of the Federal Rules of Evidence (FRE 804(b)(3)), *Williamson*, *supra* at 600-601, 604, and thus provides no authority for defendant's constitutional argument in the matter before us. Our Court in *Beasley* squarely addressed and rejected the precise argument made by defendant here, i.e., that *Williamson* and *Lilly* apply, rather than *Poole*. Furthermore, *Vincent* and *Dorchy* are distinguishable from the case at bar as *Vincent* involved the exclusion of testimonial co-defendant statements that were made to police officers, [], while *Dorchy* involved testimonial statements that were made at the prompting of an attorney during a direct examination at a previous trial that shifted the blame from the declarant to the defendant in the case at bar, []. Here, defendant has not argued that Carp's statements were testimonial. Additionally, the statements in *Vincent* and *Dorchy* involved statements that lacked an indicia of reliability, []. Hence, they are not controlling in this case.

*Gorecki*, 2008 WL 4604396, at *1–*2 (some citations and footnote omitted).

The Court finds that the Court of Appeals's decision is not contrary to, or an unreasonable application of, *Crawford*. Petitioner has failed to meet his burden and habeas relief is not warranted.

Further, even if the Court were to find that the non-testimonial statements were admitted erroneously, the Court would find that the error was harmless. A Confrontation Clause error is subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The standard for showing harmless error on collateral review is "considerably less favorable" to a habeas petitioner than the standard which is applied on direct review. On direct review, before a federal-constitutional error can be held harmless, the court must be able to declare that the error was harmless beyond a reasonable doubt. However, the harmless-error test for collateral review is different. A federal court can grant habeas relief only if the trial error had a substantial and injurious effect or influence upon the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under

this standard, a habeas petitioner is not entitled to habeas relief unless he or she can establish that the trial error resulted in "actual prejudice." *Id.* Thus, a federal-habeas court can grant habeas relief only if a habeas petitioner carries the burden of showing that a Confrontation Clause error had a substantial and injurious effect or influence on the jury's verdict. *Bulls v. Jones*, 274 F.3d 329, 335 (6th Cir. 2001).

The record in this case reveals the following. Petitioner admitted to stabbing McNeeley in the neck. See Trial Tr. vol. III, 626. He admitted to hitting her in the head. *Id.* at 628. He admitted he had to order Carp to throw the mug at her more than two times. *Id.* at 622. He also admitted that he tried to clean up the blood and broken glass with a broom. *Id.* at 651–53. Thus, there is enough evidence, outside of Smith's testimony, to support the jury's conviction. Any error in admitting the statements was harmless.

## C

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of

Petitioner's claims. *Id.* at 336–37. Petitioner has not made a substantial showing of the denial of a constitutional right, and thus, a certificate of appealability is not warranted. Further, leave to proceed *in forma pauperis* on appeal is denied as any appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

### III

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus, ECF No. 1, is **DENIED**.

It is further **ORDERED** that the Court **DECLINES** to issue a certificate of appealability.

It is further **ORDERED** that the Court **DECLINES** to grant Petitioner *in forma pauperis* status on appeal.

Dated: July 30, 2013  
s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 30, 2013.

s/Tracy A. Jacobs  
TRACY A. JACOBS